THIRD DIVISION

November 1, 2000

(
NUNC
 
PRO
 
TUNC
 September 27, 2000)

No. 1--99--1672

NANCY CUCULICH and DONALD CUCULICH, ) Appeal from the 

class plaintiffs, ) Circuit Court of

) Cook County.

Plaintiffs-Appellants, )

)

v. ) 

)

THOMSON CONSUMER ELECTRONICS, INC., )

a foreign corporation, ) Honorable

) Thomas A. Hett,

Defendant-Appellee. ) Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Plaintiffs Nancy and Donald Cuculich appeal from an order of the circuit court granting defendant Thomson Consumer Electronics, Inc.'s motion for judgment pursuant to section 2--1110 of the Illinois Code of Civil Procedure (735 ILCS 5/2--1110 (West 1998)) following the close of plaintiffs' evidence at a bench trial on their claim against defendant for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 
et
 
seq
. (West 1996)).  On appeal, plaintiffs contend that 
the trial court erred in preventing plaintiffs' expert from testifying regarding ultimate issues in the case, that the trial court erred in denying the admission of one of plaintiffs' exhibits, and that the trial court applied the wrong standard of proof to plaintiffs' claim for violation of the Consumer Fraud Act in considering defendant's motion for judgment.  For the reasons set forth below, we reverse and remand.  

On February 23, 1993, plaintiffs filed a third amended class action complaint.
(footnote: 1)  Plaintiffs brought the action on behalf of themselves and on behalf of all persons "who purchased televisions manufactured by [defendant] Thomson, which include the Thomson XS System, and labeled and advertised as 'stereo.'" In support of their complaint, plaintiffs alleged the following facts: that defendant sold television sets under the RCA and GE brand name labels, and that they purchased a Thomson manufactured television advertised as "stereo" and labeled as a "ColorTrack Stereo Monitor" in August 1991; that "[a] key element of stereo reproduction is the signal separation between left and right audio channels"; that in order to achieve stereo reproduction, the manufacturer must include circuitry that can establish the signal separation; that defendant had developed an alternate system called the XS System and that this system lacked the capacity to produce more than 7 decibels of separation between the right and left channels which was below the industry standard of 15 decibels; and that defendant, through its owner's manual, represented to consumers that its televisions are capable of decoding the Multichannel Television Sound (MTS) stereo signal, the signal through which stereo sound is broadcast, in order to reproduce MTS as it is broadcast.  

In their complaint, plaintiffs also cited the following statements in defendant's owner's manual:

"Two-Speaker Stereo Sound System--lets you enjoy high-fidelity stereo sound from the MTS stereo TV broadcasts (where available).  Built-in wideband noise reduction system automatically suppresses unwanted noise from stereo broadcasts.  Audio also reproduces 2-

channel sound from stereo VCR playback. [Page  2 of the owner's manual.]

***

Your TV is fully capable of reproducing stereo sound from TV stations transmitting stereo sound in your area.  All you have to do to enjoy stereo sound is make sure the TV's Stereo/Mono function is set to 'STEREO' so the TV can receive stereo broadcasts. [Page 14 of the owner's manual.]" 

Plaintiffs further alleged that defendant placed the label "STEREO" on the front of the XS System televisions it sold.  

Count I for "Deceit" alleged that defendant "intentionally or recklessly made false statements" about the capabilities of its televisions to induce members of the class to purchase them and that they relied on defendant's "misstatements."  Count II alleged violations of the Consumer Fraud Act (815 ILCS 505/1 
et
 
seq
.), stating that defendant made false representations of material fact concerning the capability of its televisions to reproduce MTS stereo sound as broadcast with the intent that plaintiffs and the class rely on the misrepresentations.  Among the other relief requested, plaintiffs sought actual and punitive damages.  Prior to trial, plaintiffs' claim for common law fraud was withdrawn, and the jury demand waived.
(footnote: 2)
During a bench trial on plaintiffs' claim under the Consumer Fraud Act, plaintiffs called Emil Torick, an audio engineer who served as a representative of CBS on the Broadcast Television Systems Committee (BTSC), as an expert witness.  Torick testified that the BTSC was an industry committee that convened in 1979 with the goal of making recommendations to the Federal Commerce Commission (FCC) for the purpose of establishing stereo sound reproduction for television similar to radio.  The BTSC was a joint effort by the Electronic Industries Association (EIA) and the National Association of Broadcasters (NAB).  The committee analyzed two main issues: (1) the encoding and decoding of stereo broadcasts and (2) a noise reduction system to decrease background "noise" in stereo signals. 

Torick testified that the BTSC selected a "dbx" noise reduction system and a Zenith encoding system from among several choices.  The committee presented recommendations to the FCC, but the FCC did not give the recommendations the force of law.  The committee recommended that stereo televisions use circuitry that achieved at least 20 dB's of electrical separation.  Torick criticized the "Thomson" expander (
i
.
e
., the XS System), which was an alternative system to the dbx expander that had been adopted by the committee, because it failed to achieve a separation of the left and right signals by a level of 20 dB's.  Torick equated the Thomson expander to some earlier efforts to create stereo sound and stated that the XS System could not reproduce a stereo signal as it is broadcast because of the degree the Thomson expander mixed the left and right signals.  He further testified that the effect would be an "out of phase" signal with strange acoustical effects.  Torick described the system used by defendant as being noncomplimentary to the recommendations made by the BTSC.  He admitted that the BTSC made recommendations and did not create standards and that the FCC did not require manufacturers to follow the BTSC methods.  When plaintiffs' counsel asked Torick whether defendant's representation in the documents referring to its television, that its system provided "surprisingly good" sound was a replacement for "stereo" sound, the trial court upheld defendant's objection to the question as calling for an opinion on an ultimate issue.  

On October 23, 1998, plaintiffs called Harold Sanders, an electrical engineer and the head of engineering at the Enrico Fermi Institute at the University of Chicago, as an expert witness.  Sanders denied that the decoding circuitry provided in defendant's television reproduced the MTS stereo signal because it was only capable of a much lower quality.  He believed there was a problem with defendant's decoder because it "crossed" the left and right signal, making the XS system incapable of coming close to creating adequate stereo sound.  He testified that adequate stereo was achieved by circuitry achieving 16 or 17 dB's of electrical separation.  The highest reading for the XS System was 6.77 dB of separation.  Sanders also stated that the "floating sound" described by plaintiffs was a flaw in the television's sound.  He agreed with the accuracy of a definition for "stereo" contained in the "Electronic Industry Products Dictionary," relied upon by defendant, which indicated the stereo sound was accomplished by two channels of sound creating a three-dimensional effect.  Sanders did not believe that defendant's decoder complied with this definition because it did not use two "separate" channels.  

Sanders also testified that no television was capable of reproducing sound exactly as it is broadcast.  He stated that the listener would need to add external speakers to a 19" television in order to receive good stereo sound.  He believed that it was a misrepresentation to call a television with a noncomplimentary decoding system, such as defendant's system, a "stereo" television.  He also stated that the XS System is incapable of producing stereo.  Both Sanders and Torick testified that they had never inspected or listened to the television purchased by plaintiffs.  

 Nancy Cuculich testified that she and her husband, Donald, decided to purchase an RCA television with a 19-inch screen in September 1991 after they looked at several different models.  Sound was one of the factors they considered as they shopped for the television.  Nancy stated that she and Donald believed they had purchased a stereo television.  She further stated that she and Donald both questioned whether the television had stereo sound after they had an opportunity to listen to it because the stereo sound would "fade in and out."  They heard sounds coming from the left and right of the television that sounded exactly the same.  Nancy could not hear a distinction between the two sides.  

On cross-examination, Nancy testified that she and Donald "assumed [the sound] would be like surround sound, but it sometimes does not even have that [three-dimensional] effect."  Donald testified and described hearing a similar audio effect from the television. 

Following the presentation of their witnesses, plaintiffs offered their exhibits into evidence.  Defendant objected to the admission of exhibit M.  Exhibit M was produced by defendant in discovery and contained the following label:

"Program #1 - Basic Television Receivers Participant Reference Manual/Workbook

@ - 1989 - Thomson Consumer Electronics Sales Training Department"

The portion of exhibit M, which plaintiffs directed the trial court's attention, stated:

"While monaural sound was adequate to relay the accompanying audio, reproducing it through a single speaker tended to restrict the 'sound field[.]' *** Stereo audio is the result of 'splitting' the sound signal into Left and Right channels and reproducing these separate Left/Right studio channels with two speakers set somewhat apart from each other.  The result is a broader field of sound *** simulating more closely what you would hear at a 'live' theater concert.  While a thorough technical explanation of stereo is much too complex for the time we have here, we'll offer this simple explanation *** using a music concert as an example.  

In the recording studio, the sound is picked up by a series of microphones, each positioned to pick up only a certain segment or 'location' of the audio[,] *** in short, the sounds which are created by the Left side of the orchestra and those which are created on the Right side. *** All of the audio is electronically 'mixed' into a composite stereo signal *** and electrical 'control' pulses are encoded into the signal to help maintain placement in the audio."  

The trial court heard argument from the parties regarding the admissibility of exhibit M.  Plaintiffs argued that exhibit M should be admitted into evidence because defendant's copyright and the GE and RCA logos on the document made it self-authenticating.  Plaintiffs further argued that exhibit M was an admission of the language in it by defendant.  Defendant argued in response that the fact that it had possession of the document and had produced it in discovery was not an indication that it authored the document or adopted the language in it.  Defendant claimed that plaintiffs had failed to lay any foundation for the admission of exhibit M into evidence.  

The trial court denied plaintiffs' request to admit exhibit M, finding that plaintiffs had failed to satisfy their burden of proof that defendant had adopted RCA's and GE's theories as stated in the language of the document.  The trial court also noted that the information regarding "Thomson" on the document was from a sticker that was placed on it and found that exhibit M was not admissible as an admission or a business record.    

After plaintiffs presented their evidence, defendant filed a motion pursuant to section 2--1110 of the Illinois Code of Civil Procedure.  735 ILCS 5/2--1110 (West 1998).  During the hearing on the motion, the parties' arguments primarily concerned the definition of "stereo" and whether the XS System in defendant's televisions complied with the relevant definition. Plaintiffs argued that they presented sufficient evidence to prove that "stereo" sound is accomplished by the television's ability through two channels to decode the MTS stereo signal that is broadcast by television stations in a manner that allows the viewer/listener to hear the signal as it is broadcast, 
i
.
e
., sounds originating from activity on the left side of the visual field being heard on the left by the listener and sounds originating from the right side of the visual field being heard on the right by the listener.  Defendant contended that its televisions created a three-

dimensional sound that complied with the applicable definition of stereo.  Following a hearing on the motion, the trial court stated, in part:

"So we get down to a question in my mind, is the BTS definition which would require that  both--that what comes out of the left speaker be 
what comes from the left side of the broadcast stage, so to speak, and what comes out of the right speaker comes from the right side of the broadcast stage, is that the definition of stereo that is the trade usage?  Or is the trade usage the definition that has been proposed by the defense, which is the three-dimensional sound effect?  I don't know.  And I believe since the plaintiff has the burden of proving this issue by clear and convincing evidence, if I am not convinced that the BTS is the trade usage standard, then I must give judgment to the defendant under these circumstances, and that is my order."  

During the hearing, plaintiffs did not contest defendant's argument or the trial court's statement that the burden of proof under the Consumer Fraud Act was "clear and convincing" evidence.  On December 9, 1998, the trial court granted defendant's section 2--

1110 motion.  

In the language of its order, the trial court again indicated that it found that plaintiffs had the burden to prove their case by clear and convincing evidence and that, after a review of their evidence, plaintiffs had failed to meet this burden in proving the claims made in their third amended complaint.    

Plaintiffs moved for reconsideration of the trial court's order, and the trial court denied the motion.  This appeal followed.  

We first address plaintiffs' argument that the trial court applied the wrong legal standard in considering defendant's motion for judgment.  Plaintiffs contend that the trial court erred in applying the "clear and convincing" standard of proof to their claim under the Consumer Fraud Act.  They argue that the Consumer Fraud Act only requires that they prove their claims by a preponderance of the evidence and that they were prejudiced by the application of the greater legal standard by the trial court.  Defendant argues that the trial court properly applied the "clear and convincing" standard of proof to plaintiffs' Consumer Fraud Act  claim and that plaintiffs failed to offer evidence sufficient to survive either standard.  

Section 2--1110 of the Illinois Code of Civil Procedure  (Code) provides:

"Motion in non-jury case to find for defendant at close of plaintiff's evidence.  In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor.  In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence.  If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived."  735 ILCS 5/2--1110 (West 1998).  

On review, the decision of the trial court should not be reversed unless it is contrary to the manifest weight of the evidence.  
Kokinis v. Kotrich
, 81 Ill.2d 151, 154, 407 N.E.2d 43 (1980).

The Consumer Fraud Act claim should be liberally construed to effect its purposes.  
Hoke v. Beck
, 224 Ill. App. 3d 674, 679-80, 587 N.E.2d 4 (1992).
  The Consumer Fraud Act was intended to afford a broader range of protection than the common law.   
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33, 68, 643 N.E.2d 734 (1994).  Under the Consumer Fraud Act, the plaintiff must show: (1) a deceptive act or practice; (2) an intent by the defendant that he rely on the deception; and (3) the deception occurred in the course of conduct involving trade or commerce.  
Connick v. Suzuki Motor Co.
, 174 Ill.2d 482, 501, 675 N.E.2d 584 (1996).
  The "intent" required by the statute is only the intent that the plaintiff in the primary action rely on the information that the defendant gave him, as opposed to any intent on the defendant's part to deceive.  
Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Development Co.
, 197 Ill. App. 3d 948, 953, 557 N.E.2d 246 (1990). 

When considering a section 2--1110 motion, the trial court must first determine whether the plaintiff has made out a 
prima
 
facie
 case.  
Heller v. Jonathan Investments, Inc.
, 113 Ill. 2d 60, 71, 495 N.E.2d 589 (1986).  A 
prima
 
facie
 case is made when the plaintiff has presented at least some evidence on all of the necessary elements to establish the underlying cause of action.  
Heller
, 113 Ill. 2d at 71.  If the plaintiff has not made out a 
prima
 
facie
 case, the defendant is entitled to judgment as a matter of law, but where a 
prima
 
facie
 case has been made, the trial court must still weigh the quality of the evidence as a finder of fact.  
Heller
, 113 Ill. 2d at 71.  Generally, to defeat a motion under section 2--1110, a plaintiff's evidence must be at least sufficient to prove the plaintiff's case by a preponderance of the evidence.  
Heller
, 113 Ill. 2d at 71.  If the underlying cause of action requires the plaintiff to establish his case by clear and convincing evidence, then the plaintiff's evidence must meet this greater burden of proof to avoid the entry of judgment for the defendant under section 2--1110.  
Heller
, 113 Ill. 2d at 71.  If the trial court finds after weighing the quality of the plaintiff's evidence that the evidence is insufficient to satisfy the required burden of proof, the section 2--1110 motion should be granted.  
Heller
, 113 Ill. 2d at 72.  
 

Plaintiffs rely on 
Malooley v. Alice
, 251 Ill. App. 3d 51, 621 N.E.2d 265 (1993), a Third District case, in which the 
Malooley
 court directly addressed this issue.  In 
Malooley
, the plaintiffs filed a lawsuit against the defendants to forfeit a land contract.  The defendants filed a counterclaim for violation of the Consumer Fraud Act, seeking damages allegedly suffered as the result of the plaintiffs' misrepresentations of the condition of the property at issue.  
Malooley
, 251 Ill. App. 3d at 52.  Following a three-day bench trial on the defendants' counterclaim, the trial court found that the plaintiffs had violated the Consumer Fraud Act, and the plaintiffs then filed an appeal.  In considering whether the Consumer Fraud Act required proof of its elements by clear and convincing evidence or by a preponderance of the evidence
, the 
Malooley
 court specifically noted that the Consumer Fraud Act "should be liberally construed to effect its purposes," that it is the purpose of the Consumer Fraud Act to eradicate all forms of deceptive and unfair business practices, and that there is an "easier" burden to establish a claim under the Consumer Fraud Act as opposed to common law fraud.  The 
Malooley
 court, therefore, held that "it is entirely consistent with the legislative intent behind the [Consumer Fraud Act] to establish the standard of proof as a preponderance of the evidence."  
Malooley
, 251 Ill. App. 3d at 56.

The Consumer Fraud Act does not specifically state the standard of proof required to succeed on claims under the Act.   In the present case, both parties agree that a claim for common law fraud must be proved by clear and convincing evidence.  Plaintiffs, however, agreed to withdraw their common law claim prior to trial, and the only issue here is the standard required to prove a violation of the Consumer Fraud Act.  As the 
Malooley
 court recognized, the Consumer Fraud Act is intended to provide broader protection to consumers than common law fraud claims, and the Consumer Fraud Act is to be liberally construed.  Based on the liberal intent of the legislature in enacting the Consumer Fraud Act and the fact that the Consumer Fraud Act does not specifically require a greater standard of proof to succeed on a claim under the Consumer Fraud Act, we agree with the reasoning of the 
Malooley
 court, and similarly find that plaintiffs here were only required to satisfy the requirements for a claim under the Consumer Fraud Act by a preponderance of the evidence to defeat defendant's motion.  

The trial court clearly required plaintiffs to present clear and convincing evidence of a violation of the Consumer Fraud Act to defeat defendant's motion.  The application of this greater evidentiary standard, as opposed to the less demanding preponderance standard, prejudiced plaintiffs and constituted reversible error.  Although the trial court ruled that plaintiffs' evidence did not establish a violation of the Consumer Fraud Act by clear and convincing evidence, there is no indication in the record that the trial court also considered whether the evidence at least established a violation by a preponderance of the evidence. 

Section 2--1110 of the Code requires that the trial court, as the trier of fact, weigh the quality of the evidence in consideration of the motion.  Although the testimony of plaintiffs' witnesses is included in the record, the trier of fact is in the better position to weigh the quality of evidence under the correct evidentiary standard by judging the credibility of witnesses and giving weight to their testimony.  See 
In re Application of the County Treasurer
, 131 Ill. 2d 541, 549, 546 N.E.2d 506 (1989).  Because plaintiffs were prejudiced by the trial court's application of the wrong evidentiary standard, we remand this cause to the trial court for a new trial under the proper standard.  See 
In re Enis
, 121 Ill. 2d 124, 134, 520 N.E.2d 362 (1988).  

We briefly note that defendant relies on 
Lidecker v. Kendall College
, 194 Ill. App. 3d 309, 550 N.E.2d 1121 (1990), a First District case, in support of its standard of evidence argument.  In 
Lidecker
, the plaintiffs brought claims for both common law and statutory fraud.  In the analysis of its decision to affirm the trial court's entry of judgment in favor of the defendant on its section 2--1110 motion against the plaintiff, the 
Lidecker
 court stated:

"Counts I, IV, VII, and X allege common law fraud.  Counts VI, IX, and XII allege statutory fraud.  Plaintiffs are required to prove the fraud counts by clear and convincing evidence."  
Lidecker
, 194 Ill. App. 3d at 314.

By reference to "the fraud counts," it is unclear whether the 
Lidecker
 court applied the clear and convincing evidence standard to 
both
 common law and statutory fraud, but the court does not discuss a "preponderance" standard of proof in reference to either type of fraud claim.  
We disagree with the opinion in 
Lidecker
 to the extent that it can be read to establish a clear and convincing evidentiary standard for claims under the Consumer Fraud Act as opposed to a preponderance of the evidence standard.  We find that the application of a "preponderance" standard is consistent with the purpose of the Consumer Fraud Act as discussed in 
Malooley
.  

Plaintiffs also contend that the trial court "overlooked" certain evidence they presented in their case in chief, erred in refusing too allow their experts to testify as to certain "ultimate issues," and erred in excluding their "exhibit M," a document produced by defendant and containing a 1989 copyright by Thomson's Consumer Electronics Sales Department on the cover and the RCA and GE logos, which plaintiffs claim qualified for admission by self-

authentication.  
Based on our holding that the trial court committed reversible error by applying the clear and convincing evidentiary standard, requiring reversal and remand for a new trial, we need not address these remaining issues.  

For the reasons stated, we reverse the judgement of the circuit court and remand this cause for a new trial .  

Reversed and remanded.

CAHILL and WOLFSON, JJ., concur.

FOOTNOTES
1:
The first two complaints are not at issue in this appeal. 

2:
These are not at issue in this appeal.